IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **WEATHERFORD U.S., L.P. and** § § § **WEATHERFORD TECHNOLOGY** § **HOLDINGS, LLC,** § § **Plaintiffs,** § § **v.** § § **IRON-IQ, INC.** § § **Defendant.** § § | Civil Action No. 4:23-cv-3416 Jury Trial Demanded |

### IRON-IQ, INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFFS' VERIFIED AMENDED COMPLAINT

Defendant Iron-IQ, Inc. ("Iron-IQ") hereby files this Answer, Affirmative Defenses, and Counterclaims to Plaintiffs' Weatherford U.S., L.P. and Weatherford Technology Holdings, LLC (collectively, "Plaintiffs") Verified Amended Complaint. Iron-IQ denies each and every allegation contained in Plaintiffs' Amended Complaint except those specifically admitted below.

### SUMMARY

As to Plaintiffs' summary and headings, Iron-IQ believes no response is necessary; however, if a response is deemed necessary, Iron-IQ denies the contents of the summary and headings.

### NATURE AND SUMMARY OF VERIFIED COMPLAINT

1. Iron-IQ admits that Weatherford purports to seek damages and injunctive relief regarding its alleged claims for trade secret misappropriation, breach of contract, harmful access by computer, unfair competition, and tortious interference. Iron-IQ denies the remaining allegations in this paragraph.

2. Denied.

3. Denied.

4. Denied.

5. Denied.

## PARTIES

6. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 6 and therefore denies them.

7. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 7 and therefore denies them.

8. Admitted.

## JURSIDICTION AND VENUE

9. Admitted.

10. Iron-IQ admits that the Court has subject matter jurisdiction under 28 U.S.C. § 1331. Iron-IQ denies the remaining allegations in this paragraph.

11. Iron-IQ admits that the Court has subject matter jurisdiction under to 28 U.S.C. § 1367. Iron-IQ denies the remaining allegations in this paragraph.

12. Iron-IQ admits that it is a citizen of Colorado by virtue of being organized and existing under the laws of Colorado and by virtue of having its principal place of business located in Grand Junction, Colorado. Iron-IQ lacks information sufficient to form a belief as to the remaining allegations in paragraph 12 and therefore denies them.

13. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 13 and therefore denies them.

14. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 14 and therefore denies them.

15. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 15 and therefore denies them.

16. Denied.

17. Denied.

## FACTUAL BACKGROUND

I. **Weatherford's CygNet® SCADA Platform**

18. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 18 and therefore denies them.

19. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 19 and therefore denies them.

20. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 20 and therefore denies them.

21. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 21 and therefore denies them.

II. **Iron-IQ's Unauthorized Access to Weatherford's CygNet® SCADA Platform**

22. Iron-IQ admits that one of its many product offerings includes the ability to move customers from legacy SCADA systems to Iron-IQ's superior product platform. Iron-IQ denies the remaining allegations in this paragraph.

23. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 23 and therefore denies them.

24. Denied.

25. Iron-IQ admits that Weatherford sent the August 14, 2023, Letter to Michael Ligrani, CEO at Iron-IQ, attached as Exhibit 2 to the Amended Complaint, which speaks for itself. Iron-IQ denies the remaining allegations of this paragraph.

26. Iron-IQ admits that its counsel responded on August 21, 2023, with a letter from Andrew D. Skale of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., attached as Exhibit 3 to the Amended Complaint, which speaks for itself. Iron-IQ admits that its counsel sent an email to Kevin Kirsch on August 25, 2023, attached as Exhibit 8 to the Amended Complaint, which speaks for itself. Iron-IQ denies Weatherford's recharacterization of the contents of this correspondence and therefore denies the remaining allegations of this paragraph.

27. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 27 and therefore denies them.

28. Denied.

29. Denied.

30. Iron-IQ lacks information sufficient to form a belief as to the allegations in paragraph 30 and therefore denies them.

31. Iron-IQ admits that it received correspondence from Weatherford's counsel on August 23, 2023, and August 30, 2023, attached as Exhibits 5 and 6 to the Amended Complaint, which speak for themselves. Iron-IQ lacks information sufficient to form a belief as to the remaining allegations in this paragraph, and therefore denies them.

32. Iron-IQ admits that on September 1, 2023, its counsel Andrew D. Skale corresponded with Weatherford's counsel, as shown in Exhibit 7 to the Amended Complaint, which speaks for itself. Iron-IQ denies Weatherford's recharacterization of the contents of this correspondence and therefore denies the remaining allegations of this paragraph.

33. Iron-IQ admits that Exhibit 7 states that "no employee or representative of Iron-IQ will run any version of Weatherford's CygNet software for any purpose" and "Iron-IQ does not have any copies of Weatherford's CygNet software in its possession, custody, or control."

Iron-IQ lacks information sufficient to form a belief as to the remaining allegations in this paragraph, and therefore denies them.

## COUNT I
### (Breach of the EULA for the CygNet® SCADA platform)

34. Iron-IQ incorporates by reference the foregoing responses as if fully set forth herein.

35. Denied.

36. Denied.

37. Iron-IQ admits that the EULA states it grants a license to "download, install and use the Software in executable form, solely for your internal business purposes (or academic purposes, if applicable) . . ." Iron-IQ denies all remaining allegations in this paragraph.

38. Denied.

39. Denied.

40. Iron-IQ admits that the EULA's § 15 recites the equitable remedies section quoted in the excerpted paragraph. Iron-IQ denies all remaining allegations in this paragraph.

41. Iron-IQ admits that the EULA's § 16.3 recites the attorneys' fees section quoted in the excerpted paragraph. Iron-IQ denies all remaining allegations in this paragraph.

42. Denied.

## COUNT II
### (Misappropriation of Trade Secrets under DTSA)

43. Iron-IQ incorporates by reference the foregoing responses as if fully set forth herein.

44. Denied.

45. Denied.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. Denied.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. Denied.

### COUNT III
**(Misappropriation of Trade Secrets under Texas Uniform Trade Secret Acts ("TUTSA"))**

63. Iron-IQ incorporates by reference the foregoing responses as if fully set forth herein.

64. Iron-IQ admits that Weatherford alleges TUTSA claims against Iron-IQ. Iron-IQ denies the remaining allegations in this paragraph.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

## COUNT IV
### (Unfair Competition)

70. Iron-IQ incorporates by reference the foregoing responses as if fully set forth herein.

71. Denied.

72. Denied.

73. Denied.

## COUNT V
### (Harmful Access by Computer)

74. Iron-IQ incorporates by reference the foregoing response as if fully set forth herein.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. Denied.

## COUNT VI
### (Tortious Interference with Contract)

81. Iron-IQ incorporates by reference the foregoing responses as if fully set forth herein.

82. Denied.

83. Denied.

84. Denied.

## COUNT VII
### (Copyright Infringement)

85. Iron-IQ incorporates by reference the foregoing responses as if fully set forth herein.

86. Denied.

87. Denied.

88. Denied.

89. Denied.

90. Denied.

91. Denied.

## PRAYER FOR RELIEF

Iron-IQ respectfully requests that Plaintiffs' prayer for relief be denied in its entirety, that the Amended Complaint be dismissed with prejudice, that judgment be entered in Iron-IQ's favor, and that the Court award any further relief it deems just and proper.

## DEMAND FOR JURY TRIAL

Iron-IQ also respectfully requests a trial by jury of all issues so triable.

## AFFIRMATIVE DEFENSES

Iron-IQ, for its Affirmative Defenses to the Amended Complaint, alleges as follows without assuming any burden of proof of such defenses that would otherwise rest on Plaintiffs.

### First Affirmative Defense

92. Plaintiffs' claims are barred, in whole or in part, for failure to state a claim against Iron-IQ, in whole or in part, upon which relief may be granted.

### Second Affirmative Defense

93. Plaintiffs are not seeking to protect legitimate business interests and thus their claims are not viable, and their requested relief should be denied.

### Third Affirmative Defense

94. Plaintiffs' claims are barred, in whole or in part, because they breached the covenant of good faith and fair dealing.

### Fourth Affirmative Defense

95. Plaintiffs' claims are barred, in whole or in part, pursuant to the doctrines of waiver, estoppel, laches, acquiescence, and/or unclean hands.

### Fifth Affirmative Defense

96. Plaintiffs' claims are barred, in whole or in part, by the statute of limitations.

### Sixth Affirmative Defense

97. Plaintiffs' claims are barred, in whole or in part, because Iron-IQ acted in good faith with reasonable grounds to believe that its actions were not in violation of law.

### Seventh Affirmative Defense

98. Plaintiffs' claims are barred, in whole or in part, for failure to mitigate their damages, if any.

### Eighth Affirmative Defense

99. Plaintiffs' claims are barred, in whole or in part, to the extent the damages alleged in the Amended Complaint were caused by others.

### Ninth Affirmative Defense

100. Plaintiffs' claims are barred, in whole or in part, by the defenses of payment, offset, release, accord and satisfaction.

### Tenth Affirmative Defense

101. Plaintiffs' claims are barred, in whole or in part, because they have asserted improper causes of action against improper parties.

### Eleventh Affirmative Defense

102. Plaintiffs' trade secret claims are barred, in whole or in part, because the alleged trade secrets, to the extent they can be discerned from the Amended Complaint, are readily ascertainable through legitimate means.

### Twelfth Affirmative Defense

103. Plaintiffs' trade secret claims are barred, in whole or in part, because the alleged trade secrets, to the extent they can be discerned from the Amended Complaint, do not constitute trade secrets.

### Thirteenth Affirmative Defense

104. Plaintiffs' trade secret claims are barred, in whole or in part, because the alleged trade secrets, to the extent they can be discerned from the Amended Complaint, do not have independent economic value derived from not being generally known or readily ascertainable through legitimate means.

### Fourteenth Affirmative Defense

105. Plaintiffs' trade secret claims are barred, in whole or in part, because Plaintiffs did not take reasonable measures to maintain the secrecy of the alleged trade secrets, to the extent they can be discerned from the Amended Complaint.

### Fifteenth Affirmative Defense

106. Plaintiffs' trade secret claims are barred, in whole or in part, because Plaintiffs did not create/invent or otherwise own the alleged trade secrets, to the extent they can be discerned from the Amended Complaint.

### Sixteenth Affirmative Defense

107. Plaintiffs' trade secret claims are barred, in whole or in part, because Iron-IQ did not know or have reason to know that the information included alleged trade secrets, to the extent they can be discerned from the Amended Complaint, or that they were acquired by improper means.

### Seventeenth Affirmative Defense

108. Plaintiffs' trade secret claims are barred, in whole or in part, by Plaintiffs' failure to show any unlawful use of Plaintiffs' alleged trade secrets, to the extent they can be discerned from the Amended Complaint, by Iron-IQ.

### Eighteenth Affirmative Defense

109. Plaintiffs' unfair competition claims are barred, in whole or in part, by Plaintiffs' failure to show any underlying wrongful act occurred or that the alleged underlying acts are in violation of the law.

### Nineteenth Affirmative Defense

110. Plaintiffs' copyright claims are barred, in whole or in part, under the doctrine of fair use.

### Twentieth Affirmative Defense

111. Plaintiffs' copyright claims are barred, in whole or in part, because Iron-IQ had no reason to believe the work was copyrighted.

### Twenty-First Affirmative Defense

112.   Plaintiffs' copyright claims are barred, in whole or in part, because Iron-IQ's actions were compliant with Plaintiffs' EULA, Iron-IQ had an implied license to the copyright, and/or Iron-IQ copied the work with authorization.

### Twenty-Second Affirmative Defense

113.   Plaintiffs' copyright claims are barred, in whole or in part, under the doctrine of copyright misuse.

### Twenty-Third Affirmative Defense

114.   Plaintiffs' tortious interference claims are barred, in whole or in part, by the omission and/or negligence of Plaintiffs.

### Twenty-Fourth Affirmative Defense

115.   Plaintiffs' tortious interference claims are barred, in whole or in part, by the doctrine of ratification.

### Twenty-Fifth Affirmative Defense

116.   Plaintiffs' tortious interference claims are barred, in whole or in part, by the express terms of the written contracts and/or agreements applicable to the transactions at issue in this lawsuit.

117.   This action and any relief sought by Plaintiffs may be barred in whole or in part by additional defenses that cannot now be articulated because of the generality of aspects of Plaintiffs' pleadings and the fact that discovery has not yet been taken. Accordingly, Iron-IQ reserves its right to supplement the foregoing and to raise additional affirmative defenses as they become evident through further discovery and/or investigation.

### COUNTERCLAIMS

Counterclaim Plaintiff Iron-IQ, for its counterclaims against Counterclaim Defendants Weatherford U.S., L.P. and Weatherford Technology Holdings, LLC, alleges as follows:

## STATEMENT OF FACTS

118.    After years of frustration with legacy SCADA systems like Weatherford's, Iron-IQ took a ground-up approach to build a smarter, more modern, cloud-native SCADA platform from scratch. Iron-IQ's product offerings are the next generation of SCADA technology that allows operators to get their equipment, people, and processes connected on the cloud. As one example, Iron-IQ's Patch-IQ product is not only cloud-native, but allows users to customize the screens, interfaces, and workflows so that they see and interact with only what they need. Iron-IQ and its Patch-IQ product compete with Weatherford and its CygNet platform.

119.    Iron-IQ acquires customers from many different sources and with many different requests for help. For instance, customers may come straight to Iron-IQ to build the customer's first SCADA platform; they may come to Iron-IQ from another SCADA platform; or they may request that Iron-IQ migrate them from Weatherford's CygNet platform to Iron-IQ's Patch-IQ product. If the customer requests a migration from CygNet, that customer's data must be exported from the CygNet platform to the Patch-IQ platform. Weatherford's allegations seem to indicate these actions are prohibited. In other words, Weatherford holds their customers' data hostage and demands a ransom to migrate data such that Weatherford's customers are essentially trapped.

120.    This customer data is an operational necessity, so companies cannot—and should not—be forced to lose or ransom all of their data because Weatherford makes it practically impossible from a time and cost perspective to transfer. These customers paid tens of thousands of dollars to Weatherford for the CygNet SCADA platform license that collects and maintains the customers' data. The customers own this data, and they should be able to do with it as they wish, whether at Weatherford or another SCADA provider.

121. In addition, Iron-IQ has been, and continues to be, an integrator that helps its customers maintain their SCADA systems and data, and export their data at times, on Weatherford's CygNet platform. Often, when CygNet customers do not have the in-house personnel or experience to maintain their operational data, those CygNet customers will hire an integrator to maintain it on their behalf. Iron-IQ is one of many CygNet integrators, and has held that status since 2016. Although not required, Iron-IQ went above and beyond to pay Weatherford for CygNet training and become a trusted and sanctioned CygNet integrator to act on behalf of these customers. Iron-IQ frequently interacted with CygNet software support and engaged with them on a regular basis. Weatherford and its software support personnel knew which customer systems Iron-IQ worked on behalf of, granted access to CygNet software packages, and authorized Iron-IQ's integrator status for years.

122. In mid-2023, one of Iron-IQ's customers, INEOS, asked for help migrating an asset that they purchased from Chesapeake Energy Corporation ("Chesapeake"). Notably, Chesapeake was and still is a CygNet customer.

123. As part of the sale and at Iron-IQ customer's request, Chesapeake provided configuration backup files to Iron-IQ to assist in migrating INEOS to Patch-IQ. Iron-IQ retrieved the customer's data to complete the migration from CygNet to Patch-IQ. In response, Weatherford demanded that Iron-IQ "immediately stop all unlicensed use of its software." *See* Ex. 2 (J. Kurka letter to M. Ligrani dated August 14, 2023).

124. Weatherford then proceeded to bring this action despite the evidence showing that Iron-IQ did exactly as it was instructed by Weatherford during the onsite integrator training—it downloaded the install files to export the customer's data.

125. Iron-IQ has deleted all installation files related to CygNet. As a result, Iron-IQ is unable to perform SCADA integration services for its customers, causing the loss of business and monetary damages. In addition, Iron-IQ is unable to be competitive in terms of time and cost to act as an integrator or migrate customers and has been singled out by Weatherford for these unduly burdensome restrictions.

### COUNT ONE: Tortious Interference With Prospective Business

126. Iron-IQ reinstates and incorporates paragraphs 126 as though fully set forth herein.

127. Iron-IQ was in the process of securing business as a SCADA integrator with CygNet customers, and there was a reasonable probability that Iron-IQ and those customers would have entered into a contractual relationship with Iron-IQ. There are at least a dozen prospective customers that Weatherford has interfered with in this manner.

128. Since August 2023, customers would have entered into contractual relationships with Iron-IQ to integrate assets for customers to CygNet, but for Weatherford's interference.

129. Weatherford independently, intentionally, and maliciously interfered with Iron-IQ's prospective business by demanding that Iron-IQ no longer act as an integrator and preventing Iron-IQ's access to each prospective customer's data and/or CygNet installations for purposes of maintaining, updating, and/or migrating those prospective customers' assets into or out of CygNet.

130. Upon information and belief, there was a reasonable probability that Weatherford would have entered into a relationship, or continued a relationship, with these customers but for Weatherford's conduct and misrepresentations.

131. Weatherford had a conscious desire to prevent these business relationships from occurring, and/or had knowledge that the interference was certain or substantially certain to occur

as a result of its conduct. Weatherford's hope was to either (a) steer those customers away from Iron-IQ, and toward Weatherford or (b) cause those customers to cease doing business with Iron-IQ.

132. Weatherford's conduct was malicious. It specifically targeted Iron-IQ's prospective customers with the hopes of driving Iron-IQ out of business and to prevent competitors like Iron-IQ from competing with Weatherford by developing their own SCADA platforms.

133. As a direct and proximate result of Weatherford's interference, Iron-IQ sustained actual harm and damage, including lack of access to prospective customer data and installations, precluding Iron-IQ from acting as an integrator for its customers, and revenue, good will, and loss of reputation associated with potential customers through the allegations made against Iron-IQ.

134. Iron-IQ has lost considerable revenue and goodwill and is entitled to exemplary damages because of Weatherford's malicious conduct for the reasons shown above.

## COUNT TWO:  Tortious Interference With Contract

135. Iron-IQ reinstates and incorporates paragraphs 135 as though fully and set forth herein.

136. Iron-IQ and many of its customers are parties to contracts, under which the customer agrees to pay Iron-IQ to act as an integrator or to migrate the customer into or out of its CygNet platform.

137. Upon information and belief, Weatherford willfully and intentionally interfered with multiple Iron-IQ's integrator and migration contracts, by preventing Iron-IQ from acting in its contacted for capacity, a capacity that Iron-IQ has operated under with Weatherford's blessing for years.

138. Weatherford's interference proximately caused damage or loss to Iron-IQ, at least in the form of lost revenue from those Iron-IQ customers, in amounts to be proven at trial.

## DEMAND FOR JURY TRIAL

Counterclaim Plaintiff Iron-IQ requests a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

Counterclaim Plaintiff Iron-IQ prays that Counterclaim Defendants Weatherford U.S., L.P. and Weatherford Technology Holdings, LLC be cited to appear and answer herein, and requests the following relief from the Court:

1. An award of damages, in an amount to be determined at trial, for each of the causes of action set forth above;

2. An award of any punitive, exemplary, or treble damages as authorized by law;

3. An award of prejudgment and post-judgment interest at the maximum rate allowable by law;

4. An award of costs of court and reasonable and necessary attorneys' fees to the extent allowed under the law; and

5. An award of any such other and further relief to which Iron-IQ may be entitled at law or in equity.

Dated: November 24, 2023,   Respectfully submitted,

**MICHELMAN & ROBINSON, LLP**

By: */s/ Ashley N. Moore*
 Ashley N. Moore
 SDTX No. 3864837
 amoore@mrllp.com
 300 Crescent Ct., Suite 1700
 Dallas, TX 75201
 Telephone: (214) 273-4050

 Lauren W. Varnado
 SDTX No. 1392333
 lvarnado@mrllp.com
 Jessica E. Pharis
 *SDTX Admission Pending*
 jpharis@mrllp.com
 717 Texas Avenue, Suite 3100
 Houston, TX 77002
 Telephone: (713) 422-2121

 **ATTORNEYS FOR DEFENDANT IRON-IQ, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 24th day of November 2023.

 */s/ Ashley N. Moore*
 Ashley N. Moore
 SDTX No. 3864837